Filed 10/21/14  P. v. Hofffman CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LAWRENCE ARTHUR HOFFMAN,<br><br>        Defendant and Appellant. | A139699<br><br>(San Mateo County<br>Super. Ct. No. SC075890A) |

Defendant was convicted of first degree murder after he savagely beat his 70-year-old roommate with a mallet.  He explained to the jury that the victim had confronted him with the mallet.  After disarming the victim, defendant felled him with two blows to the head.  Defendant then "snapped," apparently as a result of the effects of posttraumatic stress disorder (PTSD), and when he came to his senses realized he had continued to beat the victim, severely shattering his skull.  On this evidence, the trial court refused instructions on self-defense and involuntary manslaughter.  We affirm the conviction, finding any error in these failures to instruct to have been harmless.

## I.  BACKGROUND

Defendant was charged in an information, filed June 12, 2012, with murder.  (Pen. Code,[1] § 187, subd. (a).)  The information alleged defendant personally used a deadly or dangerous weapon (§ 12022, subd. (b)), inflicted great bodily injury on a person aged 60

---

[1] All statutory references are to the Penal Code.

years or older (§ 1203.09, subd. (a)), and personally inflicted great bodily injury (§ 1203.075, subd. (a)(1)).

Defendant lived as a boarder in the home of the victim, a 70-year-old man. The victim was a "heavy, heavy smoker" and suffered from high blood pressure, an enlarged heart, arteriosclerosis, and emphysema. He could not walk farther than a block without becoming winded. Defendant was younger and taller than the victim.

Defendant's testimony provided the only direct evidence of the killing. He said the victim was a regular customer at a pharmacy at which defendant worked as a supervisor. In July 2011, the victim invited defendant to move in with him when he found out defendant was being forced to move. The pair initially got along fine. About two months into the arrangement, however, defendant resigned his job and began to spend more time at the apartment. He found the victim to be a heavy drinker, given to moodiness. As time went on, the victim became very critical of defendant, and they had occasional conflicts. In November, defendant began to suffer four to eight "panic attacks" a day, a problem that had periodically arisen in the past.

On the evening of the killing, in early December, defendant ordered a pizza and shared it with the victim. The victim went to his room and watched television. Defendant laid down on the couch in the living room and eventually began watching a movie. The victim came out of his room and struck up a conversation. About 11:00 p.m., after the victim had retreated to his room, defendant suffered a panic attack. He periodically walked to the bathroom, seeking relief from the symptoms of the attack.

On one trip back from the bathroom, defendant encountered the victim walking toward him with a small metal mallet in his hand. As they approached each other, the victim told defendant, "Suck my cock," while holding the mallet in an upraised hand. Alarmed, defendant reached up and grabbed the mallet with his right hand. The victim then reached out and grabbed defendant "[n]ear the back of my neck." With his left hand, defendant pushed the victim, who "turned to the side," and defendant struck him twice on the side of the head with the mallet. The second blow sent him to the floor. Defendant acknowledged that "at this point [the victim] had no ability to fight." Once the

2

victim fell to the floor, defendant "snapped" and began striking the victim's head with the mallet in "a total fury." On cross-examination, defendant said he had no distinct memory of the period during which he struck the victim. He realized he had repeatedly hit the victim only in retrospect, after coming to his senses and seeing what he had done. His memory of the events was "like it was on a movie."

Shortly after the killing, defendant, distraught, appeared at the home of a friend and said he had "killed his roommate." Defendant explained the roommate had been "harassing" him for the past three weeks, and "he finally couldn't take it. And he snapped and clubbed the guy." At the friend's urging, defendant eventually called police and gave them the address of the victim in Burlingame. The victim's body, covered by three blankets, was found in a hallway of the apartment, his skull badly shattered. There were no signs of a struggle. When arrested at a motel in Southern California, defendant had slight swelling on his right hand, a small bruise on his left knee, and scratch marks on the back of his neck.

Defendant's treating psychotherapist since 2004 testified defendant had suffered from major depression, anxiety, panic disorder, claustrophobia, and antisocial personality disorder for several years. A consulting psychologist who had examined defendant largely agreed with these diagnoses, with the addition of PTSD, which developed as a result of physical and sexual abuse during defendant's childhood. The psychologist testified that a symptom of PTSD can be hypervigilance, an excessive mistrust and suspicion that can affect a sufferer's perception of events. Another typical symptom is a tendency to disassociate, an alteration of consciousness in which the sufferer blocks out aspects of his or her environment. A psychiatrist testified that defendant's PTSD and panic disorder could have been responsible for his extreme response to the victim's approach.

Defense counsel sought an instruction on self-defense, arguing defendant testified he had felt threatened by the victim, who was armed with a mallet, and had struck him in the process of disarming him. The trial court refused the instruction. The court explained its concern was "the reasonable belief at the time that the first blow was struck

3

that he was in imminent danger of being killed or suffering great bodily injury . . . . [¶] Once he disarmed the victim, in light of their relative size and the other circumstances that were present, I don't see how a reasonable juror could find that he had a reasonable belief in the imminent danger of suffering those consequences. . . . [or] that the immediate use of deadly force was necessary." The court did, however, allow an instruction on imperfect self-defense.

Defense counsel also requested an instruction on involuntary manslaughter. Counsel argued that if the jury accepted defendant acted in unreasonable self-defense, it could also conclude he did not intend to kill the victim and the effects of his psychological impairments precluded him from acting with conscious disregard for the consequences of his actions. The trial court also refused this instruction, explaining: "If there is a failure to show malice or intent to kill in this case, I believe that that can reduce it under California law to voluntary [manslaughter]. But under the facts of this case, I cannot see a place for an involuntary manslaughter instruction based on the evidence that I heard with reference to the first one or two blows in the case."

Defendant was convicted of first degree murder, and the enhancement allegations were found to be true. In response to defendant's motion for a new trial, the trial court reduced his conviction to second degree murder, concluding there was insufficient evidence of premeditation and deliberation to support the jury's verdict. Defendant was sentenced to a prison term of 16 years to life.

## II. DISCUSSION

Defendant argues the trial court erred in failing to instruct on self-defense and involuntary manslaughter.

"A trial court must instruct on all lesser included offenses supported by substantial evidence. [Citations.] The duty applies whenever there is evidence in the record from which a reasonable jury could conclude the defendant is guilty of the lesser, but not the greater, offense." (*People v. Duff* (2014) 58 Cal.4th 527, 561.) " 'The rule's purpose is . . . to assure, in the interest of justice, the most accurate possible verdict encompassed by the charge and supported by the evidence.' " (*People v. Shockley* (2013) 58 Cal.4th 400,

4

403.)  The court has a similar duty "to instruct on defenses that the defendant is relying on or that are supported by substantial evidence and are not inconsistent with the defendant's theory of the case."  (*People v. Cottone* (2013) 57 Cal.4th 269, 293.)

We review independently a claim of improper failure to instruct.  (*People v. Licas* (2007) 41 Cal.4th 362, 366.)

**A.  *Instruction on Self-defense***

The general law of homicide and self-defense was summarized in *People v. Elmore* (2014) 59 Cal.4th 121:

" 'A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder.'  [Citation.]  'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.'  [Citation.]  Thus, the mens rea required for murder is malice, express or implied.  [Citation.]

"Manslaughter, a lesser included offense of murder, is an unlawful killing without malice.  [Citations.]  Section 192 establishes three kinds of manslaughter:  voluntary, involuntary, and vehicular. . . . Punishment is mitigated for this offense, which the law deems less blameworthy than murder because of the attendant circumstances and their impact on the defendant's mental state. . . .

"Self-defense, when based on a *reasonable* belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime.  [Citations.]  A killing committed when that belief is *unreasonable* is not justifiable.  Nevertheless, 'one who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter.' "  (*Id.* at pp. 133–134.)

Three restrictions on the availability of self-defense as a justification for killing are pertinent here.  First, a killing in self-defense is justified only if the defendant fears, not merely any injury, but " ' "*imminent* danger to [his] life or great bodily injury." ' " (*People v. Stitely* (2005) 35 Cal.4th 514, 551.)  Second, " 'any right of self-defense is

5

limited to the use of such force as is reasonable under the circumstances.' " (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065.) Finally, defendant's fear of injury must have been "objectively reasonable": "[A] jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge . . . .' [Citation.] It judges reasonableness 'from the point of view of a reasonable person in the position of defendant . . . .' [Citation.] To do this, it must consider all the ' " 'facts and circumstances . . . in determining whether the defendant acted in a manner in which *a reasonable man* would act in protecting his own life or bodily safety.' " ' " (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082–1083.)

We need not resolve whether the trial court erred in refusing to instruct on self-defense because the failure to instruct was unquestionably harmless. The Supreme Court has recently confirmed that instructional error in a criminal proceeding is evaluated for harmless error under the standard of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). " '[I]n a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*Watson*].' [Citations.] ' "[M]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in *Watson.*' [Citations.] '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955.)

Defendant argues we cannot conclude the jury would not have found perfect self-defense merely because it rejected the defense of imperfect self-defense. Even assuming this to be true, the jury did not merely reject the less strict defense. It also found defendant guilty of first degree murder, a finding wholly inconsistent with defendant's claim of self-defense.

The jury was instructed with CALCRIM Nos. 520, 521, and 522, which define first degree as requiring an intent to kill, the formation of a decision to kill prior to completing the acts causing death (premeditation), and a careful weighing of the

6

considerations for and against the killing (deliberation).[2] Defendant testified that he was taken by surprise when he encountered the victim in the hall, reacted instinctively in grabbing the mallet and striking the victim twice, and thereafter repeatedly struck the victim while suffering what was, in effect, a fugue state. Given the elements of first degree murder, the jury's verdict constitutes a wholesale rejection of this account. Instead of finding the killing to have been the result of reactive instinct and illness, the jury found it to have been not merely intended, but also planned. There is no reason to think the trial court would have changed the jury's perception merely by delivering an additional instruction.

In addition, we disagree with defendant's contention that the jury's failure to find imperfect self-defense did not preclude a finding of perfect self-defense, at least in these circumstances. In *People v. Viramontes* (2001) 93 Cal.App.4th 1256, the case on which defendant places primary reliance, the trial court instructed on perfect self-defense, but it refused an instruction on imperfect self-defense—the converse of our situation. The *Viramontes* court rejected the argument that the jury's rejection of perfect self-defense rendered harmless the failure to instruct on imperfect self-defense. As the court explained, the jury might have rejected perfect self-defense because it concluded the defendant's belief in the necessity of self-defense was not reasonable. That finding would not have precluded a finding of a genuine, but unreasonable, belief. (*Id.* at pp. 1263–1264.)

The reverse is not necessarily true. For the jury to have accepted perfect self-defense here, it must have rejected imperfect self-defense because it concluded defendant's belief in the necessity of self-defense was reasonable, rather than

---

[2] " 'Murder that is premeditated and deliberated is murder of the first degree.' [Citation.] The very definition of 'premeditation' encompasses the idea that a defendant thought about or considered the act beforehand. ' " '[P]remeditation' means thought over in advance," ' and ' " '[d]eliberation' refers to careful weighing of considerations in forming a course of action . . . ." ' [Citation.] 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 443.)

unreasonable. In light of the jury's finding that the killing was intentional and premeditated, the possibility of that circumstance is slim, at best. Further, even in the absence of a perfect self-defense instruction, it is simply unthinkable a jury would conclude a defendant acted in genuine and reasonable self-defense, yet convict him or her of first degree murder. Given the jury's implicit finding of malice, it is virtually certain it rejected imperfect self-defense because it concluded defendant did not hold an actual belief in the necessity of self-defense. That conclusion would require the rejection of perfect self-defense as well.[3]

## B. *Instruction on Involuntary Manslaughter*

*People v. Butler* (2010) 187 Cal.App.4th 998, contains a painstaking analysis of the law governing involuntary manslaughter. As the court explains, involuntary manslaughter is a lesser included offense of murder, distinguished by its mens rea. Whereas murder requires either an intent to kill or a conscious disregard for life, involuntary manslaughter is a killing in which these states of mind are absent. (*Id.* at p. 1006.) As a practical matter, this requires a mens rea of criminal negligence. Criminal negligence exists when an act is committed "in a manner dangerous to life" (*id.* at p. 1008), a standard similar to that for implied malice murder, but the crimes are distinguished by the defendant's consciousness. "[F]or murder the disregard is judged by a subjective standard whereas for involuntary manslaughter the disregard is judged by an objective standard. [Citations.] Implied malice murder requires a defendant's conscious disregard for life, meaning that the defendant subjectively appreciated the risk involved. [Citation.] In contrast, involuntary manslaughter merely requires a showing that a reasonable person would have been aware of the risk." (*Id.* at p. 1008.)

Defendant argues the jury could have concluded, based on his testimony, that he never intended to kill the victim and that his mental impairment prevented him from

---

[3] In his reply brief, defendant contends we should not look to the jury's verdict in evaluating prejudice because the trial court reduced that verdict to second degree murder. We are unaware of any case law suggesting we must disregard the jury's verdict in these circumstances, and defendant's assertion is made without citation to any legal authority.

appreciating the risk to life presented by his brutal beating of the victim, thereby justifying an instruction on involuntary manslaughter. The logic is straightforward, and it appears to be correct. (See *People v. Rogers* (2006) 39 Cal.4th 826, 884 (*Rogers*) ["An instruction on involuntary manslaughter is required whenever there is substantial evidence indicating the defendant did not actually form the intent to kill."]; *People v. Saille* (1991) 54 Cal.3d 1103, 1117 [a verdict of involuntary manslaughter is warranted where the defendant demonstrates "that because of his mental illness . . . he did not *in fact* form the intent unlawfully to kill (i.e., did not have malice aforethought)"].)

Nonetheless, we need not resolve the issue because we conclude the failure to instruct on involuntary manslaughter was harmless. As noted above, involuntary manslaughter is a killing committed in the absence of both an intent to kill and a conscious disregard for life. The jury, however, convicted defendant of first degree murder, necessarily finding that he acted with deliberation and premeditation, a mens rea inconsistent with involuntary manslaughter. Even if an instruction on that crime had been given, the jury could not and would not have found him to have committed it, given its conclusions about his mental state.

This is not a situation in which the jury selected the least culpable crime on which it was instructed and might have selected an even less culpable crime, had that been available. Instead, the jury bypassed both voluntary manslaughter and second degree murder in finding defendant guilty of first degree murder. There is no reason to believe that, presented with an instruction on involuntary manslaughter, an even *less* culpable alternative, the jury would have selected it. On the contrary, under these circumstances the jury must be presumed to have evaluated the evidence and concluded defendant consciously decided to kill the victim. An instruction on involuntary manslaughter would have been superfluous.[4]

---

[4] Although we believe the *Watson* standard is appropriate for review of these errors, we also conclude they are harmless under the constitutional standard of *Chapman v. California* (1967) 386 U.S. 18.

9

As the Supreme Court held in *Rogers* under materially identical circumstances: "Assuming the trial court erred in failing to instruct on involuntary manslaughter, any error was harmless. In addition to being fully instructed on first degree premeditated murder, the jury also was instructed on the lesser included offenses of implied malice second degree murder and heat-of-passion voluntary manslaughter, both of which require higher degrees of culpability than does the offense of involuntary manslaughter. The jury rejected the lesser options and found defendant guilty of first degree premeditated murder. Under the circumstances, there is no reasonable probability that, had the jury been instructed on involuntary manslaughter, it would have chosen that option." (*Rogers, supra*, 39 Cal.4th at p. 884.)

## III.  DISPOSITION

The judgment of the trial court is affirmed.

_____
Margulies, J.

We concur:

_____
Humes, P.J.

_____
Dondero, J.

10